# Exhibit B

                                                                 1

                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       (Alexandria Division)

- - - - - - - - - - - - - x
                          :
EDWARD GILMORE,           :
                          :
        Plaintiff,        :
                          :
VS.                       : Case No. 1:13-cv-0789
                          :         (LO/IDD)
ERIC HOLDER,              :
                          :
        Defendant.        :
                          :
- - - - - - - - - - - - - x

                                  Alexandria, Virginia

                                  Tuesday, February 25, 2014

Deposition of:

                  EDWARD GILMORE,

the Witness, called for examination by counsel for

Defendant, pursuant to notice and agreement as to time

and place, at WilmerHale, 1875 Pennsylvania Avenue,

Washington, D.C., before Edward H. Schweitzer, a

Notary Reporter, where were present on behalf of the

respective parties:

            FREE STATE REPORTING, INC.
            Court Reporting   Depositions
              D.C. Area (301) 261-1902
            Balt. & Annap. (410) 974-0947

APPEARANCES:

On Behalf of the Plaintiff:

    JEFFREY T. HANTSON, ESQUIRE
    WilmerHale
    1875 Pennsylvania Avenue, N.W.
    Washington, D.C.  20006
    (202) 663-6738

On Behalf of the Defendant:

    R. JOSEPH SHER
    Assistant United States Attorney
    United States Attorney's Office
    2100 Jamieson Avenue
    Alexandria, Virginia  22314
    (703) 299-3983

Also Present:

    Karen K. Richardson
    Associate Chief Counsel
    Civil Litigation Section
    Drug Enforcement Administration

    J. Gregory Butler, Esquire
    WilmerHale

I N D E X

| Witness | Examination | Page |
|---|---|---|
| Edward Gilmore | Direct – Mr. Sher | 4 |

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Biographical Sheet | 7 |
| 2 | Memo, 9/27/13 | 61 |
| 3 | Memo, 10/9/07 | 77 |

- - -

4

1                    P R O C E E D I N G S

2                                              (9:55 a.m.)

3   Whereupon,

4                       EDWARD GILMORE

5   was called as a witness and, after first being duly

6   sworn by the notary reporter, was examined and

7   testified as follows:

8                     DIRECT EXAMINATION

9            BY MR. SHER:

10       Q.   Would you state your name for the record,

11  please, sir?

12       A.   Edward L. Gilmore, G-i-l-m-o-r-e.

13       Q.   And you are -- am I correct that you are the

14  plaintiff in a civil action captioned Edward L.

15  Gilmore against Eric Holder pending in the United

16  States District Court for the Eastern District of

17  Virginia?

18       A.   That is correct.

19       Q.   Have you ever testified in a deposition

20  before, Mr. Gilmore?

21       A.   Yes, I have.

22       Q.   How many times?

23       A.   Numerous times.

24       Q.   Numerous times.  Was that during your

25  employment at DEA?

1  bottom of the escalator, and that was the only time
2  I've seen him.  We had a very, very cordial greeting
3  and exchange of words, and that was it.
4      Q.   I take it none of the words had to do with
5  your performance rating or the selection of Ms. Roach?
6      A.   No.
7      Q.   You continued to perform in that -- until
8  Ms. Roach came on board, correct?  You continued to
9  function as deputy chief inspector?
10     A.   If you're asking me did I continue after the
11 teletype came out naming her, until the time that she
12 reported?
13     Q.   Yes.
14     A.   Yes, that's correct.
15     Q.   At some point, you made a phone call, is
16 that right, to the EEO office?
17     A.   Yes.
18     Q.   Who'd you speak to?
19     A.   I don't recall specifically who I spoke to.
20     Q.   What'd you say?
21     A.   I asked for an appointment to see an EEO
22 counselor.
23     Q.   Did you receive an appointment?
24     A.   I think I did, yes.
25     Q.   How much time between the telephone call and

1  the appointment?
2      A.   There was one point where I was told there
3  was no appointments available for five to seven days,
4  and then there was another time where I think I saw
5  somebody two days later.  My time line on that is
6  confused.  I don't remember that.
7           I know initially there was a long wait.  I
8  called them, like, a Wednesday night and didn't see
9  anybody till the following Friday or something.
10 Something of that nature.
11     Q.   And who did you see?
12     A.   I think the first person I saw was
13 Mr. Oliver, and he had to recuse himself or he
14 assigned it to somebody else.  And then I didn't see
15 that person for another two days.
16     Q.   And what -- who was Mr. Oliver?
17     A.   He was the EEO person, the head of that
18 department.
19     Q.   Okay.  What did you tell him?
20     A.   I basically felt -- I laid out why I was
21 there, why I felt I'd been discriminated against.
22     Q.   And why did you feel you'd been
23 discriminated against?
24     A.   I felt that I'd been discriminated against
25 because I was the number one -- or holding the highest

85

1  SES Performance Appraisal.  I was doing the job of the
2  Security Programs manager.  I was rated Outstanding
3  for the last three years.  I had an Excellent this
4  last year, even though it was downrated.  And I was
5  replaced by a white female who was on the Best
6  Qualified List and not -- on the Qualified List, not
7  the Best Qualified List.
8       Q.   How did you know what list she was on?
9       A.   Someone told me, and I don't recall who that
10 person was.  But someone told me.
11      Q.   You said you'd received the highest rating
12 on qualification exam or qualification process for
13 SES?
14      A.   Yes.
15      Q.   Did someone tell you that?
16      A.   It says it right there in the letter.
17      Q.   Other than the letter, did someone tell you
18 that?
19      A.   It says it right there.  "Of the 57
20 candidates that took the test that year, you are rated
21 the highest."  A hundred percent of the candidates --
22 if you read it about three or four times, then you
23 realize that it says I'm the highest rated candidate,
24 yeah.
25      Q.   Again, other than that document, did anyone

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1  ever tell you that your numerical score was higher
2  than anybody else's -- everybody else's?
3       A.    Other than talking to individuals and
4  discussing what your score was, and no one else
5  divulged that they had a higher score -- there was one
6  person that equaled that score later down the road.
7       Q.    After you spoke with Mr. Oliver, a day or
8  two later you spoke with someone else?
9       A.    Yes.
10      Q.    Do you recall who that was?
11      A.    Her name was Smith, I believe.
12      Q.    It was a woman?
13      A.    Yes.
14      Q.    Stephanie Smith?
15      A.    That probably sounds correct.
16      Q.    Okay.  What did you tell her?
17      A.    The facts that are in the EEO complaint.
18      Q.    Did you provide her with any written
19 documentation at the point of your meeting with her?
20      A.    I think she wrote out my statement, and I'm
21 sure it's contained in the EEO statement which you --
22 I'm sure you have.
23      Q.    Right.  But my question again is did you
24 provide her with any writing at your first meeting?
25      A.    I don't recall.

1    Q.   Did she ask for one?

2    A.   I don't recall.

3    Q.   Okay. What was the next step after you met
4 with Ms. Smith in the EEO process?

5    A.   I believe that the case was turned over to
6 the Marshal Service for investigation.

7    Q.   Is that shortly after you met with Ms. Smith
8 you were told that?

9    A.   I don't recall the time line. I really
10 can't specifically tell you how long it was. If you
11 want to tell me, maybe we can discuss some dates. But
12 I don't know.

13   Q.   From the time of your brief phone call with
14 Ms. Tandy to the time of your conversation with
15 Mr. Oliver, did anyone tell you who was on the
16 Qualified List, who was on the Best Qualified List for
17 the position of Deputy Chief Inspector of Security
18 Programs, SES?

19   A.   I didn't know that there was a list, and I
20 still don't know that there was a list.

21   Q.   You told us a few minutes ago that Ms. Roach
22 was on the Qualified List.

23   A.   Rating list for her personnel -- promotion
24 to SES.

25   Q.   Yeah.

1    A.    You're asking me about a specific job.

2    Q.    How did you find out that Ms. Roach was on
3 the Qualified List?

4    A.    Someone told me. I don't remember who it
5 was, whether it was somebody on the SEGAR Committee or
6 whether it was some -- a personal friend. Someone
7 told me she was on the -- her score landed her on the
8 Qualified List and not on the Best Qualified List.
9 And at that time, the agency was supposed to be
10 pulling people from the Best Qualified List.

11    Q.    What you just told us, that she was on the
12 Qualified List and that the agency was supposed to be
13 promoting people from the Best Qualified List, was
14 that what someone told you or was that -- are those
15 two separate things?

16        MR. HANTSON: Objection. Compound.

17        THE WITNESS: That is the subject of
18 discussion that I had with someone who brought that to
19 my attention, that -- and that was the subject that
20 made me file the EEO complaint.

21        BY MR. SHER:

22    Q.    Other than that conversation with whoever --
23 well, let's focus on that conversation for a minute.
24 Did it take place after your conversation with
25 Ms. Tandy and the publication of the cable announcing

1  Ms. Roach's and Mr. Parham's appointments and before
2  your conversation with the EEO office?
3      A.   Yes.
4      Q.   Okay.  Other than that conversation, which
5  may have been, you said, from somebody on the SEGAR
6  Committee?
7      A.   SEGAR Committee, which was the
8  discrimination committee -- or they had been from a
9  peer.
10     Q.   Right.
11     A.   I don't remember who I was talking to at the
12 time that gave me that information.
13     Q.   Okay.  Do you recall where the conversation
14 took place?
15     A.   No, I do not.
16     Q.   Do you recall whether it was closer in time
17 to the announcement or closer in time to your call to
18 the EEO office?
19     A.   It was closer in time to the call to the EEO
20 office because I was waiting for the outcome of the
21 Career Board announcements for the other jobs that I
22 had applied for.
23     Q.   Had the Career Board announcements taken
24 place yet, or was it before that?
25     A.   I'm sorry?

1    Q.   Your conversation about Ms. Roach's
2  placement on the Qualified List, did that take place
3  before you found out that the Career Board had not
4  selected you for either the Chicago job or the Career
5  Board Executive Secretary position?
6    A.   I'm not sure of what -- I want to say it
7  probably happened after that, but it may have happened
8  before, but I can't 100 percent say because I don't
9  remember.
10    Q.   Other than reaching out to the EEO office
11  after that conversation with whoever it was about
12  Ms. Roach's placement, did you take any other action?
13  Did you speak to any other person?
14    A.   That's a twofold question.
15    Q.   Yes.
16    A.   You asked me did I take any other action
17  other than filing the EEO complaint?
18    Q.   Yes.  Okay, let's break it down.  Did you
19  take any other action than filing the EEO complaint?
20    A.   No.  What other action -- I don't know of
21  any other action that was available to me other than
22  filing an EEO complaint.
23    Q.   Okay.  Other than the conversation you've
24  told us about with someone that you can't remember,
25  about Ms. Roach's qualification status, did you have

1          MR. SHER:  We have no further questions.
2          MR. HANTSON:  We have no further questions,
3 either.
4          COURT REPORTER:  Would the witness like to
5 read the transcript?
6          MR. HANTSON:  Yes, please.
7          (Signature not waived)
8          (Whereupon, at 1:48 p.m., on Tuesday,
9 February 25, 2014, the deposition was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF NOTARY REPORTER

      I, EDWARD H. SCHWEITZER, Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, EDWARD GILMORE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic/electronic notes and is a true record of the testimony given by the foregoing witness.

      I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

      The witness did not waive reading and signing the foregoing deposition transcript.

      In witness whereof, I have hereunto set my hand this 4th day of March 2014.

      Edward H. Schweitzer
      Notary Public in and for the
      Commonwealth of Virginia

My Commission Expires:

June 30, 2015