# DEX A

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                   Alexandria Division

4     - - - - - - - - - - - - - - - -x

5     EDWARD L. GILMORE,                 :

6               Plaintiff,               :

7          v.                           :   Civil Action No.

8     ERIC HOLDER, in his official      :   1:13-cv-789

9     capacity as Attorney General      :

10    of the United States,             :

11              Defendant.              :

12    - - - - - - - - - - - - - - - -x

13

14    CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS REDACTED

15

16              Deposition of PAMELA HORVATH

17                 Arlington, Virginia

18              Thursday, April 3, 2014

19                    2:24 p.m.

20    Job No.: 56160

21    Pages: 1 - 86

22    Reported by: Lee Bursten, RMR, CRR

DEPOSITION OF PAMELA HORVATH
CONDUCTED ON THURSDAY, APRIL 3, 2014

43

1    and building coalitions.

2        Q     In order to meet those competencies, did an

3    individual need to have a particular job description?

4        A     Not that I know of.

5        Q     Are all four competencies rated equally?

6        A     Yes.

7        Q     Did the Administrator ever instruct you to

8    rate any competency differently?

9        A     No.

10       Q     Did the Administrator ever express to you a

11   preference for a competency?

12       A     No.

13       Q     Did you provide the Administrator any

14   information other than the executive summaries and

15   the open season lists?

16       A     No.

17       Q     Did Administrator Tandy ever request from

18   you lists other than the open season list?

19       A     No.

20       Q     Why don't we walk through a job opening in

21   the SES.

22       A     Okay.

CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS REDACTED

DEPOSITION OF PAMELA HORVATH
CONDUCTED ON THURSDAY, APRIL 3, 2014

44

1        Q     So a position becomes available in the SES.

2   What do you do?

3        A     Now, we're talking just 1811 positions,

4   correct?

5        Q     That's correct.

6        A     I do nothing until the Administrator tells

7   me who she's selecting for the position.  The only

8   difference is we have positions that are regional

9   directors that are overseas.  And we do announce

10  those separately because not everybody wants to go

11  Afghanistan.

12       Q     So regardless of domestic geography --

13       A     Just domestically?

14       Q     Just domestic, you don't announce those?

15       A     No.

16       Q     So when a job becomes available, the

17  Administrator would look to the existing open season

18  list that you had compiled for her most recently?

19       A     Yes.

20       Q     As well as the executive summaries?

21       A     Yes.

22       Q     And no further information was required of

DEPOSITION OF PAMELA HORVATH
CONDUCTED ON THURSDAY, APRIL 3, 2014

49

1      A      Then repeat, if you don't mind.

2      Q      Sure.  So jobs aren't posted for SES.  So

3   were there any other ways for people to know an SES

4   position was available?

5      A      I -- probably word of mouth.  I don't know.

6      Q      So you never posted any position for SES

7   other than the international?

8      A      Foreign, right.  And the non-1811.

9      Q      So an SES position is available, an open

10   season takes place, and you've merged your lists.

11   What do you do now?

12      A      I prepare the lists, along with the

13   executive summary, and I take it up to the

14   Administrator.  I also notify the applicant of what

15   their score is and what list they're on.

16      Q      How does that process work?

17      A      Email.

18      Q      Has it always been the case?

19      A      We used to do a letter.

20      Q      When did it change?

21      A      2008.

22      Q      Do you simply hand the list to

84

1          CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2                    I, Lee Bursten, the officer before whom the

3      foregoing deposition was taken, do hereby certify

4      that the foregoing transcript is a true and correct

5      record of the testimony given; that said testimony

6      was taken by me stenographically and thereafter

7      reduced to typewriting under my direction; and that I

8      am neither counsel for, related to, nor employed by

9      any of the parties to this case and have no interest,

10     financial or otherwise, in its outcome.

11                   IN WITNESS WHEREOF, I have hereunto set my

12     hand and affixed my notarial seal this 15th day of

13     April, 2014.

14     My commission expires September 30, 2017.

15

16

17     _____

18     LEE BURSTEN

19     NOTARY PUBLIC IN AND FOR

20     THE COMMONWEALTH OF VIRGINIA

21     Notary Registration Number 7255135

22

# DEX B

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                   Alexandria Division

4      - - - - - - - - - - - - - - - -x

5      EDWARD L. GILMORE,              :

6                   Plaintiff,         :

7           v.                         :   Civil Action No.

8      ERIC HOLDER, in his official    :   1:13-cv-789

9      capacity as Attorney General    :

10     of the United States,           :

11                  Defendant.         :

12     - - - - - - - - - - - - - - - -x

13

14     CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS REDACTED

15

16           Deposition of MICHELE M. LEONHART

17                   Arlington, Virginia

18                Wednesday, April 9, 2014

19                      10:23 a.m.

20     Job No.: 56489

21     Pages: 1 - 185

22     Reported by: Lee Bursten, RMR, CRR

DEPOSITION OF MICHELE M. LEONHART - REDACTED
CONDUCTED ON WEDNESDAY, APRIL 9, 2014

117

1      A      There's a -- part of the SAPP is the

2   assessment center, and those exercises, and they

3   change from time to time, those exercises often have

4   enforcement experiences.  And the role play that you

5   do when you're a candidate is as if you were a group

6   supervisor or as if you were an ASAC.

7      Q      So --

8      A      A field group supervisor, a field ASAC.

9      Q      So it does to some degree take into account

10  enforcement experience?

11     A      The assessment itself is about the things

12  that a 14 and 15 do in the field.  And that all

13  centers around enforcement, leading these enforcement

14  groups.  So it's enforcement-centric.

15             (Leonhart Exhibit 7 was marked for

16  identification and attached to the deposition

17  transcript.)

18  BY MR. MAHR:

19     Q      What's been marked as Leonhart Exhibit 7

20  appears to be a memorandum dated October 24th from

21  Catherine Kasch -- to Catherine Kasch from Bryan M.

22  Dougherty.  And the subject is stated as, "List of

DEPOSITION OF MICHELE M. LEONHART - REDACTED
CONDUCTED ON WEDNESDAY, APRIL 9, 2014

124

1    the best qualified list that's identified here again.

2    Focusing on the time period when you were Deputy

3    Administrator, 2003 to 2007, can you tell me why the

4    DEA maintained a best qualified list?

5         A    Because the agency had agreed to a process

6    by which interested candidates could raise their

7    hand, submit a package to be rated by a panel of SES,

8    and then those names forwarded to the Administrator

9    for consideration for any SES current vacancies or

10   vacancies in the future.

11        Q    And you said "by agreement."  Agreement

12   with whom?

13        A    I believe it was an agreement between the

14   agency and the working group related to the Segar

15   litigation.

16        Q    Am I right from what you said before that

17   there are three categories of qualified lists; best

18   qualified, qualified, and minimally qualified?

19        A    Yes, there's three lists, depending on what

20   that initial rating was.

21        Q    And again sticking with the 2003-2007

22   period, what in your view was the difference between

DEPOSITION OF MICHELE M. LEONHART - REDACTED
CONDUCTED ON WEDNESDAY, APRIL 9, 2014

125

1    candidates on the best qualified list and the

2    qualified list, in your view?

3         A     In my view, it could have been just a

4    point.  I wasn't involved in the scoring, so I can't

5    tell you -- and we don't know the scores of the

6    employees.  But it was anything above this score will

7    go on this list, anything below will go on this one,

8    anything below will go on this one.

9         Q     And I recognize that one of the differences

10   among the people on the lists is the score they got.

11   My question is, you personally, did you view a

12   substantive difference in candidates based on which

13   lists they were placed on?

14        A     I viewed that the process was for the

15   Administrator to look at the three lists and look at

16   the best qualified list, consider those candidates,

17   look at the qualified list, look at those candidates,

18   and look at and consider the minimally qualified.

19   The idea was she would look at the candidates that

20   raised their hand for SES and to see what list

21   they're on.

22        Q     Did she ever express to you her views as to

# DEX C

1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3              Alexandria Division

4   --------------------------------x

5   EDWARD L. GILMORE,                :

6              Plaintiff,             :

7        v.                           :   Civil Action No.

8   ERIC HOLDER, in his official      :   1:13-cv-789

9   capacity as Attorney General      :   (LO/IDD)

10   of the United States,            :

11              Defendant.            :

12   --------------------------------x

13

14    CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS REDACTED

15         Deposition of MARK JOSEPH MAZZEI

16              Washington, DC

17            Friday, March 7, 2014

18               10:00 a.m.

19

20   Job No.:  54460

21   Pages:  1 - 168

22   Reported by:  Rebecca Stonestreet, RPR, CRR

DEPOSITION OF MARK JOSEPH MAZZEI - REDACTED VERSION
CONDUCTED ON FRIDAY, MARCH 7, 2014

43

1        A     I do know, but not because of my position as

2    executive secretary of the Career Board.  But yes.

3        Q     Okay.  How did they do that?

4        A     They set a band based on what's called a SAPP

5    score, a special agent promotion program score, and that

6    band would determine who was best qualified.

7        Q     Okay.  Were any other factors considered

8    besides the SAPP score?

9        A     I don't know.

10       Q     And what specifically -- what do you mean by a

11   band?

12       A     So each Grade 13 or Grade 14 -- and again, I'm

13   only talking about special agents.

14       Q     Right.

15       A     Each Grade 13 or Grade 14 special agent who

16   qualifies for promotion and wishes to be promoted

17   receives a SAPP score, goes through the assessment and

18   receives a SAPP score.  Agent assignment would compile

19   all the applicants for a particular position and

20   determine what the highest score was among the

21   applicants, and then the band would be set based on the

22   highest score.

DEPOSITION OF MARK JOSEPH MAZZEI - REDACTED VERSION
CONDUCTED ON FRIDAY, MARCH 7, 2014

44

1          So for Grade 14 positions, it's 10 points

2     within that high score; for Grade 15 positions, it's

3     11 points; and any applicant who had a score within that

4     band made the best-qualified list.

5          Q     Okay.  Then what do you do when you receive

6     the best-qualified list?

7          A     Compile biographical data that the Career

8     Board held at that time for each special agent, send the

9     BQL and the biographical information to the office head

10    where the vacancy existed with instructions that he or

11    she had to consider everybody on the BQL, and had the

12    opportunity to make recommendations.

13         Q     Okay.  What types of biographical data did you

14    put together?

15         A     This --  and by the way, to clarify again, I'm

16    talking about six years ago and I'm sure it's changed --

17    I'm guessing it's changed.

18         Q     Right.

19         A     So there was at that time a database where

20    special agents were afforded the opportunity to present

21    information to the Career Board, and the Career Board

22    would use that information to populate the database.  And

DEPOSITION OF MARK JOSEPH MAZZEI - REDACTED VERSION
CONDUCTED ON FRIDAY, MARCH 7, 2014

162

1    best-qualified list.  Correct?

2        A    If it's a 15 position, yes, correct.

3        Q    So the SAPP score only relates to a GS-13 or

4    GS-14 seeking a promotion to the next step up.  Correct?

5        A    Correct.

6        Q    Mr. Mazzei, you were a GS-14 prior to becoming

7    the executive secretary.  Correct?

8        A    Correct.

9        Q    And what level position is the executive

10   secretary?

11       A    15.

12       Q    In your experience, is it common that the

13   executive secretary position is a promotion for GS-14s?

14       A    I don't have a full breadth of institutional

15   knowledge.  But of late, certainly, yeah, it is common

16   for it to be filled by a 14 being promoted.

17       Q    And Mr. Mazzei, what involvement at all did

18   you have in the selection of your successor as executive

19   secretary?

20       A    None whatsoever.

21       Q    Mr. Mazzei, you earlier testified that you

22   recalled a discussion about Mr. Gilmore requesting a

# DEX D

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

EDWARD L. GILMORE,              .      Civil Action No. 1:13cv789
                                .
               Plaintiff,       .
                                .
     vs.                        .      Alexandria, Virginia
                                .      May 16, 2014
ERIC HOLDER, in his official    .      10:14 a.m.
capacity as Attorney General    .
of the United States,           .
                                .
               Defendant.       .
                                .
.  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:              AMANDA L. MAJOR, ESQ.
                               AMY P. KAPLAN, ESQ.
                               Wilmer Cutler Pickering Hale and
                               Dorr LLP
                               1875 Pennsylvania Avenue, N.W.
                               Washington, D.C. 20006


FOR THE DEFENDANT:              R. JOSEPH SHER, AUSA
                               AYANA N. FREE, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314


OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Fifth Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595


(Pages 1 - 21)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    until they had -- they waited to piggyback their rebuttal

2    expert report as a response to our supplement.

3            Now, I think it's important to look at exactly what

4    our supplement was and what the response was when talking, when

5    explaining why this is a little bit disingenuous.  All our

6    response was, all our supplemental report was was a two-page

7    report.  All I did was take new SES salary information, plug it

8    into our existing methodology, and then from that calculate a

9    different range of damages.  It used existing methodology that

10   we had laid out in our plaintiff's initial report.

11           In response to that supplement, the government

12   responded to our initial expert report.  As they said

13   previously, they objected to using Barbara Roach's salary as a

14   basis for damages.  That was something that we said in our

15   initial report, and they had the opportunity to respond to that

16   by March 10.  Again, they chose not to do so.  They decided

17   instead to file a rebuttal expert report late, and to allow it

18   at this very late stage is extremely prejudicial.

19           THE COURT:  Well, what I'm going to do, it's

20   prejudicial only if you can't adjust for it.  The trial doesn't

21   start until June 16.  There's sufficient time that if you want

22   to take a deposition of their expert, I'm going to permit that.

23           MS. KAPLAN:  Right, but --

24           THE COURT:  That's the sanction that I'll impose if

25   that's, if that's necessary.  But again, I want to make it -- I

8

1   want to be clear because there's been this low number and this

2   high number and so much data in this case, I would like each

3   side to tell me right now what they think is the most

4   reasonable damage number if Mr. Gilmore were to be successful.

5   What is your view based upon the evidence and your expert's

6   report?

7           MS. KAPLAN:  Your Honor, our, our expert report, I

8   think that our expert report is very clear, is that what we're

9   looking at is the, you know, simply the anticipated damages in

10  this case, and from that we're subtracting his actual damages.

11  We use a periodic method --

12          THE COURT:  You're not answering my question.  Give

13  me a number.  What is the number that you think is the proper

14  number here?

15          MS. KAPLAN:  My apologies, Your Honor.  I would have

16  to probably --

17          MS. MAJOR:  One minute, Your Honor.

18          THE COURT:  And, Mr. Sher, you're going to get the

19  same question from the Court.

20          MS. KAPLAN:  My apologies, Your Honor.

21          MS. MAJOR:  Your Honor, if I may address --

22          THE COURT:  Well, I normally have one attorney per

23  issue, so you decide who's going to be the person who's going

24  to talk about damages, and then that person is it for the whole

25  discussion.

1           Well, Mr. Sher, have you found yours?

2           MR. SHER:  If I might have a moment, Your Honor,

3    according to Mr. Lesch, based on the information available to

4    him, that had Mr. Gilmore been promoted and remained for the

5    remainder of his career --

6           THE COURT:  Which was about four more years.

7           MR. SHER:  Which --

8           THE COURT:  Right?  He had to retire at --

9           MR. SHER:  Which is at issue.

10          THE COURT:  He had to retire at 57.  Isn't that

11   mandatory?

12          MR. SHER:  He had to retire at 57.

13          THE COURT:  Right.

14          MR. SHER:  Whether he would have retired in March of

15   '08, when he had the opportunity that he took to become chief

16   of police in his home city, that's an entirely different

17   question.

18          THE COURT:  Right.

19          MR. SHER:  No matter what position he had at DEA.

20          THE COURT:  Right now for sake of argument, let's

21   assume that he had worked in the SES position until mandatory

22   retirement at 57.  That's certainly one of the scenarios upon

23   which the plaintiff bases their damages.

24          MR. SHER:  It is, it is.  And Mr. Lesch estimates

25   that to have been $118,000.

10

1          THE COURT:  And that as I understand it takes into

2     consideration the salary differential, that is, the extra

3     salary he would have received, and then the impact that that

4     extra earnings for four years would have had on his federal

5     retirement over the number of years that the actuarial tables

6     would say he would be expected to have lived.

7          MR. SHER:  Right.  And subtracted from that is the

8     income that -- the pension that he did receive, which it turns

9     out was greater than what he would have received had he retired

10    four years later as an SES --

11         THE COURT:  All right.  Well, I think I understand

12    that statement, but let me make sure that I articulate it.  So

13    what happened is when he did retire, he got a lump sum payment

14    or a payment.  No, actually what did he get?  He got 150,000,

15    right?

16         MR. SHER:  When he retired, he drew a pension.

17         THE COURT:  When you say he drew a pension, he

18    started collecting a monthly pension?

19         MR. SHER:  He started collecting a monthly pension.

20         THE COURT:  All right.

21         MR. SHER:  For a period of time, that monthly pension

22    was greater than it otherwise would have been because there's

23    a -- because as a law enforcement officer under the Federal

24    Employees Retirement System, he gets an additional amount

25    because he doesn't qualify for Social Security for a period

1    because law enforcement retirement ages are too low to qualify

2    for Social Security, so there is built into that system a

3    greater payment for the first period of time until the Social

4    Security element kicks in.

5             When you total up everything that he actually

6    received and would have received for the remainder of his

7    actuarial lifetime, the pension that he has received and will

8    receive is larger than the pension that he would have received

9    had he retired as a senior executive at mandatory retirement.

10            THE COURT:  So the view of the defense, I want to

11   make sure I understand, is that he actually is entitled to zero

12   damages, that there's been no loss; is that right?

13            MR. SHER:  No.

14            THE COURT:  All right.

15            MR. SHER:  That's not correct.

16            THE COURT:  All right.

17            MR. SHER:  What is correct is that when you add --

18   when you look at what he would have received as a pension, it's

19   less than what he actually will receive, so that difference has

20   to be, because it's the same payer, has to be subtracted from

21   the total damages.

22            THE COURT:  All right.

23            MR. SHER:  And the result of that --

24            THE COURT:  Is the 118,000.

25            MR. SHER:  -- is the 118.

1          THE COURT:  All right, now let me hear the

2    plaintiff's position.

3          MS. KAPLAN:  Your Honor, my apologies for not being

4    prepared with these numbers earlier.

5          THE COURT:  All right.

6          MS. KAPLAN:  The plaintiff's position is that as seen

7    in our supplemental report, the current -- our report shows

8    that our range of damages is about 150,000 to 200,000.  Now, we

9    actually by looking -- having the benefit now of Mr. Lesch's

10   report, expert report, we now see that we actually

11   underestimated Mr. Gilmore's salary, SES salary during that

12   time, so the numbers might actually be higher at that point.

13   This takes into consideration both, both the back pay and --

14   lost back pay and future pay and then prejudgment interest.

15         I'd also like to note that we'll be seeking emotional

16   damages, which we're not able to quantify at this time.

17         THE COURT:  I think it's very difficult for a police

18   officer and a chief of police to show emotional damages unless,

19   you know, he was consulting with mental health people and

20   taking medication and that sort of thing, so I think that's

21   potentially a stretch.

22         How do you address the suggestion by the government

23   that Agent Gilmore was actually looking for other positions?  I

24   mean, this Chicago chief of police position, is there evidence

25   in this record that he had been making overtures to them or